**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1949-23

AKOS SULE,

    Plaintiff-Appellant,

v.

CODIROLI FAMILY
ENTERPRISES, LP,

    Defendant-Respondent.

_____

Argued June 3, 2025 – Decided July 9, 2025

Before Judges Smith and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C-000118-22.

Robert F. Simon argued the cause for appellant (Herold Law PA, attorneys; Robert F. Simon, of counsel and on the briefs; Christine M. Faustini, on the briefs).

James K. Webber argued the cause for respondent (Webber McGill LLC, attorneys; James K. Webber, on the brief).

PER CURIAM

In this quiet title action involving a narrow strip (the "Strip") of land between two commercial properties in West Caldwell, plaintiff Akos Sule appeals from a January 16, 2024 Chancery Division order that, after a non-jury trial, granted judgment to defendant Codiroli Family Enterprises, L.P. declaring defendant the owner of the strip. We affirm.

I.

Plaintiff has owned the commercial property located at 267 Fairfield Avenue ("the Property"), designated as Block 1401, Lot 4, since 1991 when he purchased it from his predecessor-in-interest, Graco, Inc. The deed was recorded in the Essex County Register's Office ("1991 Deed"). Prior to his purchase of the Property, plaintiff obtained a survey prepared by Richard F. Smith, Jr. ("Smith Survey"). The Smith Survey was consistent with the legal description of the Property contained in the 1991 Deed, which designated the Strip as part of "Tract II."

In 1999, James and Joan Codiroli purchased the adjacent property, 1 Fairfield Crescent, designated as Block 1401, Lot 3. A year later, Codiroli's transferred Lot 3 to defendant, Codiroli Family Enterprises, L.P. and the deed was properly recorded. The Strip also appears in their deed.

A-1949-23

The Strip is an irregularly shaped portion approximately 6,262 square feet, approximately ten feet wide at its widest point and located along the shared lot line between Lot 4 and Lot 3. The Strip is comprised of an area with curbing and asphalt with parking spaces and a small grassy section.

The history of the respective properties at issue is slightly confusing but important to trace. Albert and Adele Hrubec (the "Hrubecs"), husband and wife, once owned most of the land that today comprises the two properties. By a recorded 1956 deed, the Hrubecs, conveyed land, including what is now Lot 3, to Louis Malanga, Alfred Malanga and George D. Malanga (collectively, "Malanga"). The description of the land conveyed in the 1956 Hrubec-to-Malanga deed did not include the Strip. By recorded deed in 1966 the Hrubecs conveyed the greater part of what is now Lot 4, including a majority of the Strip, to Graco Sales. By another recorded deed in 1966, Anthony and Rosalind Pio Costa, husband and wife, conveyed the rest of what is now Lot 4, including the rest of the Strip, to Graco Sales.

In 1967, Graco Sales apparently arranged with its neighbor, at this time Mal-Bros. Contracting Co. ("Mal-Bros."), Malanga's successor-in-title, to subdivide its Lot 4 to create the Strip and deed it to Mal-Bros. Meanwhile, Mal-Bros. would deed to Graco Sales a roughly equally sized parcel of land adjacent

to Lot 4, which the parties in this matter took to calling the "Bump." No documentation of that transaction has been located other than a June 1967 subdivision map (the "1967 Subdivision"). The planning board and the Mayor of West Caldwell signed and approved that proposed subdivision. The 1967 Subdivision identifies the land corresponding to the Strip as land "to be subtracted from Lot 1 [now part of Lot 4] and added to Lot 1-A [now Lot 3]" and as land "to be subtracted from Lot 2H [the rest of Lot 4] and added to Lot 1-A [now Lot 3]." The document also indicates that the parcel known as the Bump was "to be added to Lot 1 [now Lot 4]." There is no record evidence of Graco Sales having recorded the approved subdivision.

The Strip first appears in defendant's chain of title in a 1971 deed transferring Lot 3 to one of defendant's predecessors-in-interest. That same deed excludes the Bump, as described by the 1967 Subdivision. From then until the present day, Lot 3's chain of title includes the Strip. Consistent with that 1971 Lot 3 deed, by another 1971 deed recorded in May 1974, Graco Sales conveyed the current Lot 4 to Graco, Inc., without the Strip and with the Bump.

In contrast, the Strip disappears from Lot 4's chain of title in 1971, only to reappear in 1990, shortly before plaintiff purchased Lot 4. At that time, a deed that includes the Strip was recorded conveying Lot 4 that was made "as of"

4

May 12, 1972, and was from the trustee in dissolution of Graco Sales to Graco, Inc. ("May 1972 Graco Deed").  This meant that between 1974 and 1990, the only recorded deeds reflecting ownership of the Strip were in the chain of title for Lot 3.

In July 2022, plaintiff filed a complaint to quiet title against defendant and for compensation for the use of the Strip since 1991.  Defendant filed an answer with affirmative defenses and counterclaims seeking a declaratory judgment awarding the Strip to them, and ownership of the Strip by adverse possession and prescriptive easement.  Plaintiff then filed an amended complaint, adding a claim for declaratory judgment.  Defendant filed an amended answer and counterclaim, adding counts asserting ownership of the Strip by color of title, equitable conversion, and constructive trust.

In September 2023, a three-day bench was held in the Chancery Division. At trial, plaintiff produced one expert witness, an attorney who is also a licensed title insurance producer and title insurance instructor.  Defendant's witnesses included:  Janet Toner, as representative of the defendant's entity; the plaintiff; and defendant's expert, an attorney recognized as an expert in title searching, title insurance, and general property law.

A-1949-23

Plaintiff's expert was able to trace the Strip throughout plaintiff's chain of title to 1933. The expert also testified to changes of the Strip from the 1960s to the present. The expert opined that, based on the chain of title, plaintiff owned the Strip. On cross examination, the expert testified that he did not inquire into the title history of Lot 3 prior to 1971.

Toner, as managing partner for defendant, testified to her understanding that the Strip was necessary to meet West Caldwell's zoning requirements for a commercial property. She testified that without the Strip they would not meet the minimum requirements for parking, setback, and width. She also testified that to her knowledge Lot 3's occupants had used the Strip for the last fifty years. Additionally, she stated that since they acquired the property, defendant paid for the Strip's paving, sealcoating, and plowing as well as mowing the portion of the Strip that was grass. She corroborated the paving repairs with checks to the paving company.

Plaintiff testified that when he purchased the property in 1991, the Smith Survey was "commissioned in connection with the purchase of his property clearly show[ing] the [S]trip as a shaded area with notation pointing to deeds that included and deeds that excluded the strip from his lot." Plaintiff's title insurance policy did not include the Strip. Plaintiff further testified that the

6

Strip had been used by defendant as a parking lot since plaintiff took possession of the property in 1991, and that he was aware that Lot 3 had been using the Strip for parking since it was built in 1967. He stated that in 2021, for the first time, he gave permission to defendant to continue using the Strip. He also testified that he never used the Strip for parking because it would be "trespassing" and that he never completed maintenance or repairs on the paved section of the Strip as he did not want to trespass.

Defendant's expert testified as to his conclusion that plaintiff was not a bona fide purchaser of the Strip because of his actual and inquiry notice. He also outlined the applicable law regarding the filing of deeds and the implications and obligations to a purchaser who had issues with a problem in the tile search. During cross-examination on the second day of testimony, he acknowledged that he discussed his testimony with counsel over the night recess in his testimony. He did not state the substance of his discussions.

The court decided the matter on December 20, 2023, giving an oral statement of reasons. The court found that plaintiff had not established rightful ownership of the Strip. First, the court began by determining the credibility of the witnesses. The court found that while plaintiff's expert was knowledgeable, he was too entrenched in his position, "meaning that he limited his conclusions

7

solely to the record change of title as it related to plaintiff's claim of the Strip." The court further found that the expert's "inability or refusal to consider the very crux of the issue before the court impacted his credibility and the weight given by the court to his testimony and his conclusions."

In contrast, the court found the expert for the defendant "was not at all entrenched in his positions and he made allowances for factual variables." The court was particularly impressed by his ability to apply the specific facts to his conclusions. The court found him credible and gave significant weight to his testimony. The court noted that at one point on cross-examination, the expert was asked if he had discussed his testimony with defendant's counsel over the night break. While the court did not condone such conduct, it did not find it negatively impacted his credibility, particularly considering his testimony prior to the break.

The court also determined the credibility of the parties. First, the court found that Toner's testimony was credible and established defendant's use of the Strip for parking for more than thirty years, as well as the upkeep and maintenance of the Strip by defendant. In contrast, the court found plaintiff not credible, noting that plaintiff did not remember a lot of specific details, was agitated and did not answer the questions he was asked. The court further noted

8

that plaintiff tried to establish that he had granted permission to defendant to use the Strip but "was unable to present confident evidence that would allow the court to reach the conclusion that there was a definitive statement of permission given by plaintiff to defendant."

The court acknowledged that our caselaw dictates that in title disputes, courts should rule in ways supporting and maintaining the recording system. The court, citing Weintraub v. Krobatsch, 64 N.J. 445, 456 (1974), also acknowledged that "the integrity of record title in rare cases can bend to accommodate compelling equities."

Next, after defining the types of notice, the trial court determined that at the time plaintiff purchased his property, he was on actual notice that there was a potential problem with title to the Strip. The court found plaintiff had actual notice because: (1) the 1991 Smith Survey highlighting the uncertainty regarding the Strip; (2) defendant's use of the Strip, or at least a portion of the Strip, as a parking area; and (3) the "as of" deed with a nineteen-year discrepancy between the date of preparation and the date of recording.

The court also found that the evidence put plaintiff on inquiry notice, requiring him to make a reasonable and diligent inquiry regarding defendant's ownership to claims to the Strip. Moreover, the court determined that plaintiff

failed to do so and "even if [he] was the holder of legal title, it would be inequitable for him to retain and enjoy the beneficial interest as against the interest of the defendant who is equitably entitled to that enjoyment."

Although the court determined that equity required defendant to prevail, it also considered whether defendant had obtained the Strip by adverse possession. After outlining the requirements for adverse possession, the court determined that defendant had satisfied its burden of proof and that plaintiff did not challenge nor present evidence to the contrary. As such, the court stated defendant had proved that it adversely possessed the property. On January 16, 2024, the court executed an order effectuating its decision.

On appeal, plaintiff argues the court made incorrect factual findings and then misapplied the applicable laws concerning: (1) the ownership of property based on recorded deeds of conveyance; and (2) adverse possession.

II.

We begin by acknowledging the limited scope of our review. In an appeal from a non-jury trial, appellate courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015); Balducci v. Cige, 240 N.J. 574, 595 (2020); State v. McNeil-Thomas, 238 N.J. 256, 271 (2019).

"Appellate courts owe deference to the trial court's credibility determinations as well because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). This deferential standard is applied "because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci, 240 N.J. at 595 (2020).

"A reviewing court must accept the factual findings of a trial court that are 'supported by sufficient credible evidence in the record.'" State v. Mohammed, 226 N.J. 71, 88 (2016) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). "Reviewing appellate courts should 'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Griepenburg, 220 N.J. at 254 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

If issues on appeal present mixed questions of law and fact, we give deference to the supported factual findings of the trial court but review de novo the trial court's application of legal rules to the factual findings. State v. Pierre,

223 N.J. 560, 576 (2015); State v. Nantambu, 221 N.J. 390, 404 (2015); State v. Harris, 181 N.J. 391, 416 (2004).

III.

A.

Plaintiff posits that the trial court improperly determined the witnesses' credibility and then gave undue weight to defendant's expert testimony. He also contends the court placed too much weight on the purported 1967 subdivision. We disagree. The court's determinations were supported by competent, relevant, and credible evidence and therefore should not be disturbed. See Griepenburg, 220 N.J. at 254.

Moreover, plaintiff's argument that the court improperly weighed defendant's expert's testimony because the expert spoke with defense counsel during the overnight recess is without merit. The plaintiff bases this argument on Rule 4:14-3(f), which says that during a deposition, there should be no communication between the witness and their lawyer while the witness is being questioned-except for discussions about legal privilege, confidentiality, or some other limited circumstances permitted by court order. However, this Rule specifically refers to depositions, not trials. The comments to this Rule also clarify that the restrictions only apply while the deposition is actively

happening, and "clearly does not address consultation during overnight, lunch and other breaks."  Pressler & Verniero, N.J. Ct. Rules, cmt. on R. 4:14-3(f) (2025) (emphasis added).

Certainly, there are preclusions preventing an attorney from dictating a client's trial testimony by telling the witness what to say.  We have concluded a trial judge holds "wide discretion" to determine whether to prevent a witness from consulting with his attorney during a break in testimony.  Horn v. Village Supermarkets, 260 N.J. Super. 165, 175 (App. Div. 1992).  In our view, at issue is the balance between a client's right to engage legal representation and whether demonstrated conduct would interfere with the truth-seeking function of a trial.

In this matter, plaintiff challenged defendant's expert's credibility by asking the expert whether he discussed his testimony during the overnight break. That question standing alone did not violate any recognized privilege. Importantly, plaintiff presents no allegation that the expert altered his testimony following the overnight recess.  In fact, plaintiff fails to identify any post-break inconsistencies in the witness's testimony, suggesting a need for further examination.  In light of the record, which is void of evidence of improper coaching of the witness, we conclude the judge's decision to determine the expert was credible was not an abuse of discretion.

Next, plaintiff contends the evidence presented shows that under the Recording Act, he owned the Strip. He argues the trial court erroneously disregarded the principles of race notice in N.J.S.A. 46:26A-1 (the "Recording Act"), by improperly imputing actual and inquiry notice of issues relating to ownership of the Strip to plaintiff at the time plaintiff purchased Lot 4 in 1991. We disagree.

N.J.S.A. 2A:62-1 to -10 governs quiet title actions. N.J.S.A. 2A:62-1 provides:

> Any person in the peaceable possession of lands in this state and claiming ownership thereof, may, when [their] title thereto, or any part thereof, is denied or disputed, or any other person claims or is claimed to own the same, or any part thereof or interest therein, . . . maintain an action in the superior court to settle the title to such lands and to clear up all doubts and disputes concerning the same.

"One of the purposes of [the Recording Act] is to permit a landowner to sue for clarification of the validity or reach of [their] title in circumstances that otherwise preclude a forum for the resolution of such a dispute." Suser v. Wachovia Mortg., FSB, 433 N.J. Super. 317, 325 (App. Div. 2013). A principal purpose of the recording statutes is to protect bona fide purchasers "'against the assertion of prior claims to the land based upon any recordable, but unrecorded

instrument.'" Cox v. RKA Corp., 164 N.J. 487, 507 (2000) (quoting 29 N.J. Practice, Law of Mortgages, § 102 at 386 (Roger A. Cunningham & Saul Tischler) (1975)). "New Jersey's recording statutes address important public policy concerns." Island Ventures Assocs. v. N.J. Dep't of Env't Prot., 179 N.J. 485, 492 (2004). Absent unusual equity considerations, our Supreme Court has encouraged all New Jersey judges to make decisions "that will best support and maintain the integrity of the recording system." Palmarg Realty Co. v. Rehac, 80 N.J. 446, 453 (1979).

A bona fide purchaser for value is one who takes title to property without notice of a prior interest "and has paid a valuable consideration therefor[e]. . . ." Venetsky v. W. Essex Bldg. Supply Co., 28 N.J. Super. 178, 187 (App. Div. 1953); see also Monsanto Emps. Fed. Credit Union v. Harbison, 209 N.J. Super. 539, 542 (App. Div. 1986). There are three ways a party can be on notice of property interests: actual notice, constructive notice, and inquiry notice.

> Actual notice arises when the purchaser has actual knowledge or information that a claim is outstanding against the property he or she proposes to acquire. It exists even though the purchaser may have to make an inquiry to ascertain the validity of the claim.
>
> Constructive notice is notice inferred from the record and it exists whether or not the purchaser inspects the record. It exists when the record reveals the

A-1949-23

outstanding claim even if the purchaser must make an inquiry to ascertain the validity of the claim.

Inquiry notice (notice inferred from secondary facts) exists when the purchaser has notice of some fact that, in accordance with human experience, is sufficiently curious or suspicious that the purchaser should be obliged to make a further inquiry into it. If a reasonable inquiry would reveal that there is another outstanding interest, then the purchaser is on inquiry notice of that interest.

[6 Powell on Real Property § 82.02 (1)(d)(iv) (Michael Wolf ed. 2019) (emphasis in original).]

We are satisfied that the court's findings on actual and inquiry notice in its well-reasoned decision are supported by the record. The court found notice because (1) the 1991 Smith Survey highlighted the uncertainty regarding the Strip; (2) plaintiff's knowledge of defendant's predecessors use of the Strip as a parking lot before plaintiff purchased it; and (3) the "as of" deed with a nineteen-year discrepancy between the date of preparation and the date of recording, and (4) plaintiff's title policy, which excluded the strip. Plaintiff therefore had an obligation to make further inquiry but failed to do so.

With plaintiff's title called into question, the trial court properly assessed which party had equitable title to the Strip. In terms of real property, our Court has created the legal fictions of "equitable ownership" or "equitable conversion" which both rest "on the principle that, as between parties to a contract, equity

16

regards things as done that were agreed to be done." Jock v. Zoning Bd. of Adjustment of Twp. of Wall, 184 N.J. 562, 587-88 (2005). Here, based on plaintiff's actual and inquiry notice, as well as the history of the properties including the 1967 subdivision, the court was well within its discretion to award the Strip to defendant.

C.

We also concur with the court's decision on adverse possession. Adverse possession is a method of acquiring title through the expiration of statutes of limitation which bar an ejection action and pass title to the property from the record owner to the possessor. Patton v. N. J. Dist. Water Supply Comm'n, 93 N.J. 180, 186 (1983); O'Keeffe v. Snyder, 83 N.J. 478, 494 (1980); Stump v. Whibco, 314 N.J. Super. 560, 576 (App. Div. 1998). Our Supreme Court has recognized that "adverse possession promotes certainty of title and protects the possessor's reasonable expectations." Devins v. Borough of Bogota, 124 N.J. 570, 577 (1991) (citations omitted). Adverse possession "rewards the person who has made productive use of the land, it fulfills expectations fostered by long use, and it conforms titles to actual use of the property." Randolph Town. Ctr., L.P. v. Cnty. of Morris, 374 N.J. Super 448, 458 (App. Div. 2005), aff'd in part,

17

<u>vacated in part on other grounds</u>, 186 N.J. 78 (2006) (quoting <u>Restatement (Third) of Property: Servitudes</u> § 2.17 cmt. c (2000)).

The adverse possession statute states:

> Thirty years' actual possession of any real estate, uninterruptedly continued by occupancy, descent, conveyance or otherwise, wherever such possession commenced . . . shall be a good and sufficient bar to all prior locations, rights, titles, conveyances, or claims whatever, not followed by actual possession as aforesaid, and shall vest an absolute right and title in the actual possessor and occupier of all such real estate.

> [N.J.S.A. 2A:14-31.]

In order to obtain property by adverse possession or to create an easement by prescription, however, the use must be adverse or hostile, visible, open and notorious, and continuous. <u>Yellen v. Kassin</u>, 416 N.J. Super. 113, 119-20 (App. Div. 2010); <u>see also</u> <u>Plaza v. Flak</u>, 7 N.J. 215, 222-23 (1951). The proponent of the easement has the burden of establishing the elements by a preponderance of the evidence. <u>Yellen</u>, 416 N.J. Super. at 120.

"Open" use, in the context of easement law, "generally means that the use is not secret." <u>Id.</u> at 121. The related term "notorious" generally means actual knowledge on the part of the property owner or that the use is widely known. <u>Id.</u> In addition,

A use is adverse or hostile if a person uses the property of another under a claim of right, "pursued with an intent to claim against the true owner in such circumstances of notoriety that the owner will be aware of the fact and thus alerted to resist the acquisition of the right by claimant before the period of adverse possession has elapsed."

[Id. at 120 (quoting A.J. & J.O. Pilar, Inc. v. Lister Corp., 22 N.J. 75, 81 (1956)).]

Yet, the factual determinations of the trial court will be afforded deference if supported by competent, relevant, and reasonably credible evidence. Griepenburg, 220 N.J. at 254. Here, the trial court's conclusion that defendant, in the alternative, obtained title through adverse possession is supported by the evidence produced at trial. After the court outlined the adverse possession requirements, the court determined all four elements had been met.

Although plaintiff argues that the trial court improperly placed a burden on him rather than defendant, read in context, the court's statement instead states that defendant had provided the court with evidence to satisfy its burden of proof and that plaintiff was unable to challenge or present evidence to the contrary. The court stated:

Here, [ ] plaintiff does not persuasively challenge the length of use of the strip by defendant. Plaintiff claims, however, that such uses have been with his permission, thereby defeating the application of adverse possession. As noted previously the fact of permissive use was not

established by plaintiff through the evidence presented at trial.

This does not represent a burden shift. Instead, plaintiff's claim that he granted permission to defendant was rejected by the court because it was neither credible nor substantiated.

Likewise, plaintiff's contention that the court "glazed over the criteria for adverse possession" and "re-packaged its conclusions regarding actual and inquiry notice, . . . as findings that the defendant simultaneously proved the third and fourth elements of adverse possession" is unmoving. In its decision, the trial court stated that because it made a finding that defendant's actions put plaintiff on actual and inquiry notice, that defendant had satisfied the adverse and notorious prongs.

Moreover, the trial testimony showed that the defendant or its predecessors had used the property for parking for more than thirty years. Toner testified owners of Lot 3 had been using the Strip for about fifty years. The plaintiff also testified that defendant's use extended beyond thirty years. Therefore, the court's findings were supported by competent, relevant, and credible evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

20                                                                 A-1949-23